**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: 18-cv-22372-JB

M.D., C.F., and E.M., individually
and on behalf of a class
of similarly situated persons,

      Plaintiffs,

v.

CENTENE CORPORATION, INC. and
CENTENE MANAGEMENT
COMPANY, LLC,

      Defendants.

_____/

**PLAINTIFFS' MOTION FOR FINAL APPROVAL**
**OF CLASS ACTION SETTLEMENT, APPLICATION FOR SERVICE AWARDS,**
**APPLICATION FOR ATTORNEYS' FEES AND EXPENSES, AND**
**MEMORANDUM OF LAW IN SUPPORT**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ........................................ 3

    A.    The Action........................................................................................................ 3

    B.    The Settlement Terms And Agreement ........................................................ 4

        1.    *The Settlement Class*.......................................................................... 4

        2.    *The Relief and Settlement Consideration* ........................................ 5

        3.    *The Settlement's Effect on Non-Class Members*...................................... 6

        4.    *Release of Claims*.............................................................................. 6

        5.    *Class Counsel Fees and Expenses and Named Plaintiffs' Case Contribution Service Award* ......................................................... 7

    C.    Preliminary Approval, Notice and Settlement Administration...................... 7

III.   THE SETTLEMENT WARRANTS FINAL APPROVAL ............................. 9

    A.    The Settlement is the Product of Good Faith, Informed, and Arm's-Length Negotiations Among Experienced Counsel...................... 10

    B.    The Settlement Provides the Class with the Relief that Caused the Litigation to be Filed, Which Demonstrates Beyond Question that the Settlement is within the Range of Reasonableness......................................................................... 11

    C.    The Settlement will Obviate Litigation Hurdles for the Class........................ 12

    D.    Counsel Submits that the Settlement is Reasonable and in the Class Members' Best Interests.......................................................................... 12

IV.    CLASS COUNSEL SHOULD BE AWARDED THEIR FEES AND COSTS, AND THE CLASS REPRESENTATIVES SHOULD RECEIVE THEIR REQUESTED SERVICE AWARDS ......................... 13

    A.    The Court Should Award Requested Attorneys' Fees and Expenses ............ 14

        1.    *The contingent nature of the fee, the financial burden carried by Class Counsel, and the economics of prosecuting a class action support the award* ......................................... 16

       2.     *The requested fee amount is well below the market rate in complex, contingent litigation* ........................................... 17

       3.     *The novelty and difficulty of the questions at issue and undesirability of the case* ......................................................... 17

       4.     *The skill, experience, and reputation of Class Counsel* ......................... 18

       5.     *The result achieved for the Class* ............................................... 18

       6.     *The time and labor of class counsel and preclusion of other work* ....... 19

       7.     *Reaction of the Class* ................................................................. 20

   **B.**     **Service Awards of $1,500 are Appropriate** ........................................ 20

**V.**    **CONCLUSION** ................................................................................. 21

Plaintiffs M.D., C.F., and E.M., on behalf of themselves and a class of similarly situated persons, and with the consent of Defendants Centene Corporation, Inc., and Centene Management Company, LLC (collectively, "Centene") (the "Parties") move for an entry of an order (1) granting final approval of the class action settlement as set forth in the parties' Settlement Agreement and Release (the "Settlement" or "Agreement") [D.E. 35-1], (2) certifying a class for settlement purposes, (3) granting service awards to the class representatives, and (4) awarding class counsel their attorneys' fees and expenses.[1]

## I.     <u>INTRODUCTION</u>

On October 30, 2019, the Court preliminarily approved the Settlement, which was reached by the parties after extensive, rigorous negotiation. The Settlement prevents Centene from reinstating certain fibrosis score restrictions to deny coverage of a life-saving cure to approximately 1,500 Class Members. The Class Members are (1) insureds that have health insurance coverage through a Centene subsidiary, (2) that requested coverage for a hepatitis C drug, and (3) were denied coverage based on use of a fibrosis restriction, which is essentially a restriction that limits coverage only to those insureds whose livers met a certain score that was indicative of liver damage. The Settlement has a significant value, because if a Class Member were to buy a cure on the retail market, a single course of treatment would cost $94,000, for an aggregate value to the Class of $141 million.

The parties seek entry of an order providing for final approval of the Settlement Agreement, final certification of the Settlement Class, the award of attorneys' fees and expenses to Class Counsel (which the Settlement requires Centene to pay in addition to providing

---

[1] Unless otherwise noted, all capitalized terms used here have the same definition as that provided in the Settlement Agreement. As used herein, the term "Class" means the Settlement Class, and "Class Member" means a Settlement Class Member, as those terms are defined in the Settlement Agreement.

coverage for hepatitis C drugs), together with service awards to the named Plaintiffs. The Court should order final approval of the Settlement because it is fair, reasonable, adequate, and an excellent result for Class Members. The undersigned are well positioned to make this recommendation after having litigated this case and similar cases. Class Counsel spent many hours researching and investigating claims, allegations, and defenses regarding Centene's denial of hepatitis C drug coverage, including reviewing policy documents and relevant medical literature, and speaking with numerous Class Members. Our investigation gives us a thorough understanding of the strengths and weaknesses of this case, and allows us to readily evaluate the risks associated with it, as well as the fairness of the proposed Settlement, which was reached after months of arm's-length negotiations, involving many informal negotiations.

The Settlement Agreement is a tremendous victory for Class Members because it removes the life-shortening fibrosis restriction and allows the Class Members to gain access to a life-saving cure. The benefits and value of that relief to Class Members must be analyzed in light of the risks of protracted and contested litigation—including appeals and dispositive motion practice—which might have resulted in no recovery, no expanded coverage for Harvoni treatment, and no cure for Class Members' hepatitis C. The Settlement is in the best interests of the Class Members and warrants final approval.

The adequacy of the Settlement, and the effectiveness of the Court-authorized notice, are reflected in the positive reaction from the Class. The deadline for Class Members to opt-out or object was January 15, 2020. We have received no objections, and only one opt-out request in response to the Settlement, which demonstrates its fairness and adequacy.

Finally, Plaintiffs and Class Counsel respectfully request that the Court award three hundred fifty thousand dollars ($350,000) in attorneys' fees and expenses, an amount that was

negotiated only after all Class benefits had been agreed to. The requested amount will be separately paid by Centene in addition to, and without diminishing, the Settlement's benefits to the Class. This fee is an amount equivalent to approximately less than 0.3% of the value of the Settlement's benefits to the Class, and is unquestionably within the parameters of reasonableness established by the Eleventh Circuit.

Accordingly, Plaintiffs respectfully request that the Court grant final approval of the Settlement Agreement and approve their application for Class Counsel attorneys' fees and Class Representative service awards.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      The Action

On June 13, 2018, plaintiffs M.D., C.F., and E.M., on behalf of themselves and all similarly-situated persons, sued Centene, alleging that Centene had instructed its subsidiary to refuse to cover and pay for hepatitis C drugs unless an insured already had suffered severe, irreparable liver damage. Plaintiffs brought claims based on tortious interference and unjust enrichment, seeking declaratory and injunctive relief on behalf of people who (1) had or were insured by Centene's subsidiaries under a "Health Insurance Marketplace" plan, other individual or commercial plan, and (2) had been denied hepatitis C drugs based on the fibrosis restrictions.

On August 6, 2018, Centene filed its motion to dismiss arguing that the Plaintiff's claims were moot because Centene had eliminated the disputed coverage guidelines effective July 1, 2018 [D.E. 14 at 1], as well as other defenses. Following Centene's motion, the parties' counsel engaged in negotiations for approximately six months until reaching settlement on February 26, 2019. [D.E. 26].

## B.    The Settlement Terms and Agreement

This case arises from Centene's purported instructions to related entities to apply certain fibrosis restriction scores to determine coverage for hepatitis treatment, which led to denials of coverage of the hepatitis C drugs—breakthrough treatments that amount to miracle cures for hepatitis C, the first of which (Harvoni) the Food and Drug Administration approved in October 2014. Following the FDA's approval of Harvoni, insurers, such as Centene, continued to use guidelines that restricted coverage in many circumstances to those insureds who met certain fibrosis score restrictions by obtaining a specific Metavir score typically associated with severe or advanced fibrosis.

After substantial and sustained effort by the Parties, the Parties were able to reach a proposed Settlement, which provides up to approximately 1,500 Class Members with an actual, immediate, and substantial benefit. The Settlement also would provide this valuable benefit of expanded coverage of the hepatitis C drugs to non-Class Members, including those Centene insureds who were deterred from seeking treatment by the fibrosis restrictions, and those who are new (or future) enrollees in a Centene health insurance plan. In other words, Centene's agreement not to reinstate the fibrosis restrictions previously in place has life-changing and potentially life-saving implications for thousands of Class Members and non-Class Members. This is an outstanding result.

### 1.    The Settlement Class

The Settlement provides relief to the Settlement Class, which includes all persons currently or formerly covered under any individual health insurance plan or policy with a medical benefit or prescription drug benefit (or both) insured or administered by any Centene-related entity whose request for prior authorization for coverage of hepatitis C was denied based

4

on a Metavir score or level of fibrosis between October 1, 2014, and December 31, 2018, who
have not subsequently received direct acting antiviral therapy.

### 2.    *The Relief and Settlement Consideration*

Under the Settlement, Centene agreed not to reinstate fibrosis restrictions as a basis to
deny coverage for the hepatitis C drugs under Centene's medical coverage guidelines for
hepatitis C, absent a review of coverage for potential modification based on scientific analysis or
requirements of governmental or other plan sponsors. In other words, for any person who was
previously denied coverage (and for any person who seeks coverage in the future), Centene
would not be permitted to deny coverage for the hepatitis C drugs based on that person's failure
to demonstrate any particular level of fibrosis. Centene agreed to make reasonable attempts to
provide notice to any Class Member who was previously denied coverage for the hepatitis C
drugs and who has not since received the drugs from a Centene-related entity, to advise them that
there is no longer any fibrosis restriction in the coverage policy for the drugs, and to advise them
that they may resubmit their request for coverage if they currently have an individual insurance
plan or policy through one of Centene's subsidiaries. Class Members may make new requests for
coverage of the drugs and be granted such coverage a maximum of two additional times.

In addition to these valuable settlement considerations, any Class Member previously
denied coverage for the hepatitis C drugs who is no longer a member of one of Centene's
subsidiaries had the opportunity to enroll in an individual plan by a Centene-related entity in the
Class Member's state. Centene shall not be responsible for paying any Class Member's premium
for enrollment in a Centene-related entity individual plan. Other Class Members who are no
longer covered by a Centene-related entity and are uninsured, or have no coverage of the
hepatitis C drugs, or cannot enroll with a Centene-related entity, may submit a Claim through the

claims administrator for a single payment of up to $2,200 per person.[2] The Class Members may use the payment in any manner he or she wishes. Centene will pay on a claims-made basis up to a total of $125,000.00.

### 3.  The Settlement's Effect on Non-Class Members

The proposed Settlement **does not** adversely affect any non-Class Members who are Centene policy holders and will not limit their future claims. If such non-Class Members contract hepatitis C and their medical provider applies for pharmaceutical treatment, the same revised policy, not utilizing the fibrosis restriction scores, will apply to them. Moreover, Centene-related entities, consistent with the intent of the Settlement, have notified medical providers who are likely to order hepatitis C pharmaceuticals, such as hepatologists, gastroenterologists, and infectious disease practitioners to notify them of the change in policy so it can be applied to Class Members and non-Class Members, alike.

### 4.  Release of Claims

In exchange for the settlement consideration, members of the Settlement Class will release Centene (as defined in the Settlement Agreement) and its respective past, present, and future officers, directors, shareholders, stockholders, policyholders, members, principals, parents, subsidiaries, affiliates, divisions, partners, insurers, reinsurers, employees, servants, agents, representatives, administrators, executors, beneficiaries, heirs, trustees, fiduciaries, attorneys, accountants, auditors, advisors, predecessors-in-interest, successors-in-interest, and assigns, from any and all past, present, or future claims, actions, demands, lawsuits, rights, liabilities, damages, losses, indebtedness, obligations, attorney's fees, interest, expenses, costs, and causes of action,

---

[2] The maximum payment amount is the estimated annual national out-of-pocket sales premium for bronze level health plan in 2018.

arising from Centene's denial of coverage for the hepatitis C drugs based on Centene's fibrosis restrictions, or from any claims asserted or which could have been asserted in this action.

### 5. *Class Counsel Fees and Expenses and Named Plaintiffs' Case Contribution Service Award*

Centene has agreed to pay, separate and apart from the cost of providing hepatitis C treatment and the $125,000 claim fund, three hundred fifty thousand dollars ($350,000) in attorneys' fees and expenses, which includes case-contribution service awards ("service awards") not to exceed $1,500 to each named plaintiff. Class Counsel agree not to seek additional remuneration in connection with this action. If any award is granted to Class Representative Plaintiffs M.D., C.F., or E.M, the amount to be paid to Class Counsel shall be reduced by the total amount of that award. The Parties agree that consideration of whether to grant or deny these requested sums is to be separate and apart from the Court's consideration of the fairness, reasonableness, and adequacy of the settlement.

### C.     Preliminary Approval, Notice and Settlement Administration

The Court preliminary approved the terms of the Settlement Agreement and certified the proposed Settlement Class on October 30, 2019. *See* Order Granting Preliminary Approval (D.E. 44) (hereinafter the "Preliminary Approval Order"). The Court found that:

> (a) the Parties consummated the Settlement after Class Counsel had duly investigated the issues raised by Plaintiffs' claims and the Parties had conducted arm's-length negotiations; (b) the Settlement provides valuable consideration; and (c) the Settlement is sufficiently fair, adequate, and reasonable to the Settlement Class and within the reasonable range of possible final approval to warrant providing notice to Settlement Class Members and holding a full hearing on the Settlement.

D.E. 44 at ¶ 2. In the Preliminary Approval Order, the Court also approved the proposed Class Notice and notice plan, finding that it meets the requirements of Rule 23 of the Federal Rules of Civil Procedure, and provides the best notice practicable under the circumstances. *Id*. at ¶¶ 11-

12. The Court ordered Centene's settlement administrator to begin dissemination of the Class Notice within 30 days of the entry of the Preliminary Approval Order. *Id*. at ¶¶ 12, 27.

The Settlement Administrator, KCC Class Action Services, LLC ("KCC"), obtained a list of names with addresses of individuals who were identified as Settlement Class Members. *See* **Exhibit A** – Declaration of Meagan Brunner ("KCC Decl.") at ¶ 7. Prior to mailing, KCC processed the list through the National Change of Address (the "NCOA") database. *Id.* The NCOA contains all requested changes of address which have been filed with the United States Postal Service. *Id.* KCC mailed a total of 1,566 notices using First-Class mail. *Id.* at ¶ 8. After KCC mailed the notices, 228 packets were returned as undeliverable. *Id.* at ¶ 10. KCC searched 228 undeliverable addresses, and for 30 of them, KCC found updated addresses and re-mailed the packets to those addresses. *Id.*

On November 27, 2019, KCC created a case-dedicated website for Settlement Class Members to obtain information about the Settlement. *See* KCC Decl. at ¶ 11. Specifically, the website provided Settlement Class Members with full-length Notice as well as relevant court documents, and important dates. *Id*. KCC also activated a toll-free number with live operator support, which allowed Settlement Class Members to listen to answers to frequently asked questions regarding the Settlement, leave a request to have a notice mailed to them, and speak with a live operator. *Id*. at ¶ 12. KCC also mailed the requisite notice under the Class Action Fairness Act on January 31, 2020, and sent to the U.S. Attorney General, the Attorneys General for each of the 29 states where Class Members reside, and the parties of interest to this action. *Id*. at ¶ 5.

Pursuant to the Settlement Agreement and Preliminary Approval Order, the deadline for Class Members to object to or opt out of the Settlement Agreement was January 15, 2020. *See*

D.E. 44 at ¶ 27. As of this date, KCC received no objections and only one opt out request. *See* KCC Decl. at ¶¶ 11-12.

### III.   THE SETTLEMENT WARRANTS FINAL APPROVAL

Public and judicial policy both strongly favor pretrial settlement of litigation. This policy is particularly compelling in class actions and other complex litigation. *See In re United States Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits."); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) ("our judgment is informed by the strong judicial policy favoring settlement"); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)[3] ("Particularly in class action suits, there is an overriding public interest in favor of settlement."); *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) ("there exists 'an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex'").

The cases ask courts considering class action settlements to be guided not only by the strong public policy favoring settlement, but also by "the realization that compromise is the essence of settlement." *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982); *see Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 538 (S.D. Fla. 1988) ("When exercising its discretion, a court should always review the proposed settlement in light of the strong judicial policy that favors settlements.") (citations omitted).

Final approval under Fed. R. Civ. P. 23(e) is warranted when a class action settlement is "fair, adequate and reasonable [and] . . . not the product of collusion between the parties." *Bennett*, 737 F.2d at 986-87 (internal quotation marks and citations omitted); *accord Cotton*, 559

---

[3] Opinions of the Fifth Circuit issued prior to October 1, 1981 are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209-11 (11th Cir. 1981) (*en banc*).

F.2d at 1330. Courts are "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial." *In re Mex. Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000) (citations omitted). Instead, courts in this Circuit consider the following factors: (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense and duration of litigation; (3) the stage of proceedings at which the settlement was achieved and the amount of discovery completed; (4) the probability of the plaintiff's success on the merits; (5) the range of possible recovery; and (6) the opinions of class counsel, class representatives, and the substance and amount of opposition received. *Leverso v. SouthTrust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994); *see also Bennett*, 737 F.2d at 986. "In assessing these factors, the Court 'should be hesitant to substitute . . . her own judgment for that of counsel.'" *Lipuma*, 406 F. Supp. 2d at 1315 (quoting *In re Smith,* 926 F.2d 1027, 1028 (11th Cir. 1991)). Application of these factors to the Settlement demonstrates that it should be approved.

### A.    The Settlement is the Product of Good Faith, Informed, and Arm's-Length Negotiations Among Experienced Counsel

The threshold consideration is whether a proposed settlement is the product of fraud or collusion between the parties. "In determining whether there was fraud or collusion, the court examines whether the settlement was achieved in good faith through arm's-length negotiations, whether it was the product of collusion between the parties and/or their attorneys, and whether there was any evidence of unethical behavior or want of skill or lack of zeal on the part of class counsel." *Canupp v. Sheldon*, 2009 WL 4042928, at *9 (M.D. Fla. 2009) (citing *Bennett*, 737 F.2d at 987, n.9). Courts "presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." 4 NEWBERG ON CLASS ACTIONS § 11:51

(4th ed. 2010); *accord Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) ("Absent evidence of fraud or collusion, such settlements are not to be trifled with.").

Here, the Settlement was the product of significant give-and-take by the Parties in arm's-length negotiations. Over the course of the six months (from August to February) following Centene's motion to dismiss the complaint, the Parties spent countless hours explaining their positions and views on all issues. *See* **Exhibit B** – Declaration of Andres Rivero (the "Rivero Decl.") at ¶¶ 6, 7-11. These negotiations informed the Parties as to the strengths and weaknesses of the case so as to produce a fair and reasonable settlement.

    **B.**    **The Settlement Provides the Class with the Relief that Caused the Litigation to be Filed, Which Demonstrates Beyond Question that the Settlement is within the Range of Reasonableness**

Centene's denial of coverage of the hepatitis C drugs to Plaintiffs and Class Members through the use of the fibrosis restrictions is what caused Plaintiffs to file this action. The Settlement provides for an agreement not to reinstate those restrictions, absent a review of coverage for potential modification based on scientific analysis or requirements of governmental or other plan sponsors. Thus, the Settlement paves the way for up to approximately 1,500 Class Members to promptly benefit from expanded coverage for the hepatitis C drugs (as well as new enrollees, and insureds who were deterred from seeking treatment by the fibrosis restrictions). As explained above, the value of this relief to Class Members is substantial.

Plaintiffs and the Class faced hurdles in obtaining this relief, made apparent by Centene's attempt to dismiss the action. *See* Rivero Decl. at ¶¶ 9, 13. Although Settlement occurred before the Court ruled on the motion, an unfavorable ruling would have significantly delayed obtaining relief for the Class, even if an appeal were expedited and successful. "[T]he more complex, expensive, and time consuming the future litigation, the more beneficial the settlement becomes as a matter of efficiency to the parties and the Court." *In re Citigroup Inc. Bond Litig.*, 296

F.R.D. 147, 155 (S.D.N.Y. 2013). Continued litigation would have required the Parties and the Court to expend substantial resources litigating complex issues of law and fact, would have significantly delayed certain Class Members' receiving any relief (even if Plaintiffs were to prevail), and would have presented the wholly unacceptable (and very real) risk that at the end of the day, certain Class Members would not obtain coverage for a breakthrough treatment to cure their debilitating, degenerative, potentially fatal, and formerly incurable disease. Because of the Settlement, Class Members will have access to expanded coverage for a cure for the deadly disease that many have had for decades. The relief provided by this Settlement unquestionably falls within the range of reasonableness.

### C.   The Settlement will Obviate Litigation Hurdles for the Class

Any evaluation of the benefits of settlement must be tempered by the recognition that any compromise involves concessions by all settling parties. Indeed, "the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982) (quoting *Cotton*, 559 F.2d at 1330). As noted above, Plaintiffs and the Class Members faced the hurdle of responding to a motion to dismiss the action. The risks included but were not limited to potential dismissal, for mootness, as well as other defenses that were the basis of dismissals in other similar cases. The Settlement obviates all these hurdles, eliminates significant litigation risks, and ensures that fibrosis restrictions for coverage of the hepatitis C drugs will not be reinstated, benefitting thousands. *See* Rivero Decl. at ¶¶ 13-14.

### D.   Counsel Submits that the Settlement is Reasonable and in the Class Members' Best Interests

Lastly, the belief of experienced counsel that a negotiated settlement is in the best interests of the class carries significant weight. *In re Gen. Instrument Sec. Litig.*, 209 F. Supp. 2d

423, 431 (E.D. Pa. 2001) ("Significant weight should be attributed to the belief of experienced counsel that the settlement is in the best interests of the class."). Class Counsel have significant experience in litigating numerous class actions, in state and federal court, and experience in litigating cases involving the denial of hepatitis C treatment. *See* Rivero Decl. at ¶ 11. Our experience gives us a thorough understanding of the strengths and weaknesses of this case and allows us to readily evaluate the risks associated with it, as well as the fairness of the proposed Settlement. That experience tells us that this Settlement is an excellent result for the Class.

Moreover, the overwhelming Class Member support for the Settlement is further evidence of its fairness, reasonableness and adequacy. *See, e.g.*, KCC Decl. at ¶¶ 14-15. There were no objections to the Court's preliminary approval of the Settlement, and, as of this date, there are no objections to final approval, and only one opt-out. *Id.* This "low percentage of objections demonstrates the reasonableness of [the] settlement," and supports its approval as fair and reasonable. *Perez*, 501 F. Supp. 2d at 1381; *accord Saccoccio*, 297 F.R.D. at 694 ("low resistance" to settlement consisting of eight objections and 122 opt-outs supported approval).

Whether considered independently or together, a review of the above factors confirms that the Settlement is fair, reasonable, and adequate. As such, it should be finally approved.

## IV.    CLASS COUNSEL SHOULD BE AWARDED THEIR FEES AND COSTS, AND THE CLASS REPRESENTATIVES SHOULD RECEIVE THEIR REQUESTED SERVICE AWARDS

Class Counsel immersed ourselves in this dispute as soon as we learned of it from aggrieved Class Members. For the extensive and relentless work we undertook in fighting for, and obtaining, the lifting of the fibrosis restrictions, Class Counsel seek three hundred fifty thousand dollars ($350,000) in attorneys' fees and expenses. This amount is a miniscule percentage (less than 0.3%) of the monetary value of the Settlement's benefits to the Class, and is eminently reasonable by any other measure. Attached as **Exhibit C** is a declaration from

13

Norman Moscowitz ("Moscowitz Decl.") attesting to the reasonableness of the class-counsel fee. A service award of up to $1,500, which will be paid from the aggregate amount of $350,000, to each Class Representative also is appropriate and should be awarded.

### A.    The Court Should Award Requested Attorneys' Fees and Expenses

Both the United States Supreme Court and the Eleventh Circuit have expressly approved of calculating attorneys' fees by applying the percentage-of-recovery method to the total monetary value of the settlement. *E.g.*, *Montoya v. PNC Bank, N.A.*, 2016 WL 1529902, at *16 (S.D. Fla. 2016) (citing *Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980), and *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295-96 (11th Cir. 1999)); *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768 (11th Cir. 1991). The Eleventh Circuit recently confirmed that class counsel's fee award also should be based on the value of "any non-monetary benefits conferred upon the class by the settlement," such as injunctive relief, as well as "the economics involved in prosecuting a class action." *Poertner v. Gillette Co.*, 618 Fed.Appx. 624, 628 (11th Cir. 2015); *see David v. Am. Suzuki Motor Corp.*, 2010 WL 1628362 (S.D. Fla. 2010) (settlement with ascertainable benefits may be treated as a common fund to which a percentage fee may be awarded, even if the fee is separately paid by the defendant). Thus, class counsel fees in a common-benefit settlement "shall be based on a reasonable percentage of the total benefit" of the settlement provides to the class. *Poertner*, 618 Fed.Appx. at 628 (citing *Camden I*, 946 F.2d at 774).

Using the common fund/common benefit approach, the benchmark for a reasonable class counsel fee is 25%. *Camden I*, 946 F.2d at 774. This benchmark may be adjusted up or down (generally from 20% to 30%) based on the individual circumstances of each case, using the factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 448 F.2d 714 (5th Cir. 1974). *See Camden I*, 946 F.2d 774-75; *Waters*, 190 F.3d at 1294 (applying *Camden I* and affirming fee

award of 33 1/3% of $50 million settlement, where District Court had used a 30% benchmark

and adjusted it upwards). In this case, the value of the benefit that Class Counsel obtained for the

Class is easily quantified, by multiplying the cost of the hepatitis C treatment ($94,000 per

patient for the shortest course of treatment) times 1,500 (the number of Class Members). *See*

Moscowitz Decl. at ¶ 8. That number amounts to at least $141 million worth of actual benefits to

the Class. *Id.* The requested attorneys' fee of three hundred fifty thousand dollars ($350,000) is

less than 0.3% of the value of the Settlement's common benefit to the Class. *Id.* at ¶ 9. This is a

very modest fee under Eleventh Circuit precedent. *Camden I*, 946 F.2d at 774-875; *see also*

*Poertner*, 618 Fed.Appx. at 628.[4]

    The fee here is not only modest when compared to the benchmark of 20 to 30 percent, but

is amply supported by application of the *Johnson* factors. Those factors are: (1) the time and

labor required; (2) the novelty and difficulty of the questions involved; (3) the requisite skill to

perform the legal service properly; (4) the preclusion of other employment by the attorney due to

---

[4] Courts of this Circuit have not only rejected the lodestar method (hours times rate) for calculating class counsel fees, but even as a so-called "cross-check" on the reasonableness of a percentage fee. *Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1362 (citing, *inter alia*, Alba Conte, ATTORNEY FEE AWARDS § 2.7, at 91 n. 41 ("the lodestar approach should not be imposed through the back door via a 'cross-check.'")). In rejecting the lodestar approach altogether in common fund cases, the *Camden I* court decried its inefficiencies, 946 F.2d at 773-75, while other courts have criticized its "incentive to keep litigation going in order to maximize the number of hours included in the court's lodestar calculation." *In re Quantum Health Resources, Inc.*, 962 F. Supp. 1254, 1256 (C.D. Cal. 1997). "Under *Camden I*, courts in this Circuit regularly award fees based on a percentage of the recovery, without discussing lodestar at all." *Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1363 (citation omitted). In any event, even if the Court were to perform a lodestar cross-check, the requested attorneys' fee would remain eminently reasonable, because it would amount to a 2.32 multiplier. *See* Moscowitz Decl. at ¶ 4 n. 2. This is a modest multiplier. The range is typically 2.26 to 4, with many cases awarding much higher multipliers. *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334 (S.D. Fla. 2007) (noting lodestar multiples "in large and complicated class actions" range from 2.26 to 4.5, while "three appears to be average" and "most lodestar multiples awarded in cases like this are between 3 and 4"). And that conclusion would be supported by the numbers alone, before considering the difficulty or undesirability of this action, let alone the result achieved.

acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the

time limitations imposed by the client or the circumstances; (8) the amount involved and the

results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the

"undesirability" of the case; (11) the nature and length of the professional relationship with the

client; and (12) awards in similar cases. *See Camden I*, 946 F.2d at 772 n.3. The Court also may

consider the time required to reach settlement, the existence of substantial objections from class

members, the existence of non-monetary benefits of the settlement, and the economics involved

in prosecuting a class action. *Id*. at 775.

> **1.    *The contingent nature of the fee, the financial burden carried by Class Counsel, and the economics of prosecuting a class action support the award***

A determination of a fair fee for Class Counsel must include consideration of the

contingent nature of the fee, the outlay of out-of-pocket expenses by Class Counsel, and the fact

that the risks of failure and nonpayment in a class action are extremely high. *E.g., Pinto v.*

*Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007). These factors weigh in

favor of awarding Class Counsel the requested fee, which amounts to less than 0.3% of the value

of the benefit obtained by the Settlement. Class Counsel have received no compensation during

the course of this litigation and have incurred over $148,000 in unpaid fees and costs (using the

lodestar method, even though courts should not impose a lodestar analysis through "the back

door" as a "cross-check," *see supra* note 4). Those unpaid fees and costs were fully at risk and

would have remained unpaid if Centene had prevailed. From the moment Plaintiffs and Class

Counsel began their investigation, there was a significant likelihood of no recovery and no

compensation. *See* Moscowitz Decl. at ¶ 11.

**2.      *The requested fee amount is well below the market rate in complex, contingent litigation***

A fee amounting to less than 0.3% of the value of benefits obtained for the Class is well below the market rate for class actions. "The percentage method of awarding fees in class actions is consistent with, and is intended to mirror, practice in the private marketplace where attorneys typically negotiate percentage fee arrangements with their clients." *Pinto*, 513 F. Supp. 2d at 1340. In individual cases, attorneys typically contract with clients for contingent fees between 30 and 40 percent. Moscowitz Decl. at ¶ 12. These percentages are the prevailing market rates throughout the United States for contingent representation. *See Pinto*, 513 F. Supp. 2d at 1341 (citing, *inter alia*, *Kirchoff v. Flynn*, 786 F.2d 320, 323 (7th Cir. 1986)). In making a determination of what constitutes a fair percentage fee, this Court should be guided by those market rates and this Circuit's benchmark standard. A separately paid attorneys' fee that amounts to less than 0.3% of the value of the benefit obtained for the Class is fully consistent with, and falls far below, this Circuit's benchmark for fees in common fund class actions, in which courts often award higher percentages. *See, e.g.*, *Gutter v. E.I. Dupont De Nemours & Co.,* 95–2152–Civ–Gold (S.D. Fla. May 30, 2003) (33-1/3 %); *Waters,* 190 F.3d 1291 (affirming 33-1/3%); *Tapken v. Brown,* Case No. 90- 0691-CIV, 1992 WL 178984, Fed. Sec. L. Rep. P 96805 (S.D. Fla. 1995) (33%); *In re Home Shopping Network Sec. Litig.*, Case No. 87-428-T-13(A) (M.D. Fla. 1991) (33%).

**3.      *The novelty and difficulty of the questions at issue and undesirability of the case***

The record makes clear that this case presents complex questions of law and fact under insurance regulation and the common law. The action required Plaintiffs to demonstrate that Centene was denying coverage through internal guidelines that had no medical basis, and that this was a breach of contract, that would support injunctive relief and specific performance to

invalidate the fibrosis restrictions. To prove this, Plaintiffs would have had to conduct significant discovery and retain experts, which would have been expensive and risky. Moscowitz Decl. at ¶ 13. In short, the undesirability of this case was close to unique. After Plaintiffs filed their complaint, Centene removed the fibrosis restrictions, and argued in its motion to dismiss that the Plaintiffs' claims were mooted. The fact that Class Counsel reached an outstanding settlement that provides the core relief sought by this action amply supports award of the requested fee. *Id.*

### 4.     *The skill, experience, and reputation of Class Counsel*

This litigation required a high degree of skill and experience given the complexity of the issues. Class Counsel employed and deployed their significant experience gained from litigating numerous class actions in state and federal court. Beyond that, Class Counsel's reputation, diligence, expertise, and skill are reflected in the results achieved. Moscowitz Decl. at ¶ 14. They resolved this dispute and obtained $141 million worth of coverage in the face of an order dismissing the case with prejudice. Moreover, the quality of Class Counsel and their achievement in this case is equally shown by the strength of their opponents, Hogan Lovells LLP, one of the finest defense firms in the country. This factor supports awarding the requested fee.

### 5.     *The result achieved for the Class*

At the end of the day, the result achieved for the class is the most important factor in assessing the reasonableness of a requested fee award. *E.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("critical factor is the degree of success obtained"); *Pinto*, 513 F. Supp. 2d at 1342; *Behrens*, 118 F.R.D. at 547-48 ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained."). The result achieved here is exemplary, because the Settlement provides precisely what this action was filed to obtain, coverage for hepatitis C treatment through invalidation of the fibrosis restrictions.

In considering the result achieved, courts consider the value of *both* monetary and injunctive relief. *See Poertner*, 618 Fed.Appx. at 628; *Perez*, 501 F. Supp. 2d 1360; *Lipuma,* 406 F. Supp. 2d at 1323; *In re Managed Care Litig.*, 2003 WL 228500700, at *6 (S.D. Fla. 2003). Here, the Settlement delivers at least $141 million worth of insurance coverage to a Class of 1,500 insureds. This is a conservative estimate that does not take account of the cost of a longer course of hepatitis C treatment that some Class Members may require. Nor does it account for the fact that this relief has far-reaching consequences to those who (1) were deterred from seeking coverage by the fibrosis restrictions, or (2) recently became insured by Centene, or (3) will become insured by Centene. In view of the overarching fact that obtaining this relief is what caused Plaintiffs to file suit in the first place, the Settlement is an outstanding result that supports Class Counsel's fee request. Moscowitz Decl. at ¶¶ 16-18.

### 6.    *The time and labor of class counsel and preclusion of other work*

Prosecuting and settling this action demanded considerable time and labor, which began with interviewing insureds who had contacted us and investigating their potential claims. While a settlement was achieved prior to the resolution of Centene's dispositive motion, Class Counsel engaged in settlement negotiations with defense counsel for nearly six months. In sum, achieving this Settlement demanded considerable time and labor. Moscowitz Decl. at ¶ 19. To date, Class Counsel has spent more than 300 hours on this matter, and further time will be required in order to conclude it. *Id.*

The time and energy required by this matter necessarily limited the time available for other matters. There are only so many hours in a day. Moreover, Class Counsel is a small litigation firm, so the time devoted to prosecuting this case precluded us from taking on other, hourly work that would not have presented a significant risk of nonpayment. *Montoya*, 2016 WL

1529902, at *17 (finding as a factor in support of fee that "the law firms prosecuting the case are of small size . . . and thus the time devoted to the class action precludes other employment.").

### 7.   *Reaction of the Class*

As of this date, the claims administrator has received only one opt-out request, and we have received no objections to the Settlement. *See* KCC Decl. at ¶¶ 11-12. The Class Notice was sent to 1,566 former and current Centene insureds. *See Id.* at ¶ 5. The fact that only one of the Class Members opted out and no one submitted an objection supports the fee request. Moscowitz Decl. at ¶ 20; *see Pinto*, 513 F. Supp. 2d at 1343.

### B.   **Service Awards of $1,500 are Appropriate**

The Court should approve a service award of $1,500 (to be paid from the aggregate amount of $350,000) for each representative Plaintiff, as is customary and well-supported by precedent in the Eleventh Circuit. *See, e.g., Pinto*, 513 F. Supp. 2d at 1344. In instituting and prosecuting this action, each of the representative Plaintiffs acted as a private attorney general in seeking a remedy for a public wrong. *See id.* (Private class actions are a primary weapon in the enforcement of laws that protect the public.). Moreover, in pursuing this action, Plaintiffs courageously made public the private fact that they suffered from a debilitating, life-threatening disease. Further, despite suffering from that debilitating disease, the Plaintiffs freely gave of their time consulting with and providing essential documents to Class Counsel. Finally, the Class Notice advised Class Members that Plaintiffs would apply for a service award of $1,500 each, and no Class Member has objected to that reasonable request. Approval of the requested service awards is warranted.

## V. <u>CONCLUSION</u>

For these reasons, Plaintiffs respectfully request that the Court grant final approval of the

Class Action Settlement, award Class Counsel their fees and expenses, and award each of the

Class Representative Plaintiffs the requested service award.


Respectfully submitted on April 21, 2020.

**RIVERO MESTRE LLP**
*Counsel for Plaintiffs and the Class*
2525 Ponce de Leon Blvd., Suite 1000
Miami, Florida 33134
Telephone:  (305) 445-2500
Facsimile:   (305) 445-2505
E-mail: arivero@riveromestre.com
E-mail: jmestre@riveromestre.com
E-mail: arolnick@riveromestre.com
E-mail: cwhorton@riveromestre.com
E-mail: ddaponte@riveromestre.com
Secondary: palvarez@riveromestre.com

By: /s/ Andrés Rivero
ANDRÉS RIVERO
Florida Bar No. 613819
JORGE A MESTRE
Florida Bar No. 088145
ALAN H. ROLNICK
Florida Bar No. 715085
CHARLES E. WHORTON
Florida Bar No. 46894
DAVID L. DAPONTE
Florida Bar No. 1002724

21

## **CERTIFICATE OF SERVICE**

I certify that on April 21, 2020, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record either by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S. Mail.

<div align="center" style="margin-left:50%">
s/ Andrés Rivero
ANDRÉS RIVERO
</div>